1 | MARC M. SELTZER (54534)
mseltzer@susmangodfrey.com
2 | STEVEN G. SKLAVER (237612)
ssklaver@susmangodfrey.com
3 | AMANDA BONN (270891)
abonn@susmangodfrey.com
4 | OLEG ELKHUNOVICH (269238)
oelkhunovich@susmangodfrey.com
5 | SUSMAN GODFREY L.L.P.
1901 Avenue of the Stars, Suite 950
6 | Los Angeles, CA 90067-6029
Phone: (310) 789-3100
7 | Fax: (310) 789-3150

8 | JOSEPH GRINSTEIN (*pro hac vice* to be filed)
jgrinstein@susmangodfrey.com
9 | SUSMAN GODFREY L.L.P.
1000 Louisiana, Suite 5100
10 | Houston, TX 77002-5096
Phone: (713) 651-9366
11 | Fax: (713) 65-6666

12 | Attorneys for Plaintiff Sarah Key, individually and
on behalf of all others similarly situated

13 |

14 | **UNITED STATES DISTRICT COURT**

15 | **NORTHERN DISTRICT OF CALIFORNIA**

16 | **SAN JOSE DIVISION**

17 |

| | |
|---|---|
| SARAH KEY, individually and on behalf of all others similarly situated, | CASE NO: 17-cv-00442 |
| | |
| Plaintiff, | CLASS ACTION |
| v. | |
| | COMPLAINT FOR VIOLATIONS OF ANTITRUST LAWS, STATE UNFAIR COMPETITION LAWS, AND THE COMMON LAW OF UNJUST ENRICHMENT |
| QUALCOMM INCORPORATED; and DOES 1 through 100, | |
| Defendants. | |
| | JURY TRIAL DEMANDED |

Plaintiff Sarah Key ("Plaintiff"), individually and on behalf of all those similarly situated, by and through her counsel, brings this Class Action Complaint ("Complaint") against Defendant Qualcomm Incorporated ("Qualcomm"); and Does 1 through 100, on personal knowledge with respect to herself and her own acts, and on information and belief as to other matters, alleges as follows:

## I.    NATURE OF ACTION

1.    Plaintiff and the class of similarly situated persons she seeks to represent are purchasers of cellular devices, including cellular phones and tablets. Such devices contain a chipset (also known as a baseband processor)—a key component that allows the device to transmit voice and data across wireless networks. Defendant Qualcomm has acquired and maintained a monopoly in baseband processors through anticompetitive practices that drive competitors out of the market, bar new entrants, suppress innovation, and result in overcharges to consumers who purchase cellular devices.

2.    Qualcomm's illegal business practices are being investigated by law enforcement agencies around the globe. In the past two years, three countries' antitrust enforcement authorities have found Qualcomm to be a monopolist. Qualcomm has engaged in a series of secret agreements designed to maintain its monopoly power and hide its illegal conduct. In at least one such agreement, Qualcomm included a gag order to prevent an aggrieved party from seeking judicial relief in an effort to keep courts, regulators, and consumers in the dark.

3.    Qualcomm's unlawful and anticompetitive conduct includes at least the following:

a.    Qualcomm has monopolized markets for both CDMA baseband processors and premium LTE baseband processors used in cellular phones and tablets. At all times relevant to this complaint, Qualcomm has had monopoly power with respect to CDMA baseband processors and premium LTE baseband processors. Qualcomm has maintained its monopoly power through its course of anticompetitive conduct.

b.    Qualcomm's license agreements with cellular device OEMs, together with the terms of its supply and strategic/market-development agreements linked to those

1

license agreements, result from an exercise of Qualcomm's monopoly and market power and are unreasonable restraints of trade.

       c.     Qualcomm's practices harm competition and the competitive process by foreclosing competitors, reducing innovation, and raising costs to consumers.

4.     Qualcomm, along with many other companies, contributed to the development of technological standards that govern how cellular phones connect to voice and data networks. Companies in the wireless industry form standard setting organizations ("SSOs") to develop such technical standards to ensure interoperability and compatibility of products and wireless networks. Patents that are essential to practicing a technical standard are called standard essential patents or "SEPs," as such patents must be licensed by companies in order to make products or services that practice the standard.

5.     Once a standard is adopted, participants may face substantial switching costs in abandoning initial designs and substituting different technology, meaning that an entire industry effectively becomes "locked in" to the standard. Similarly, once a standard is in place, companies can no longer substitute alternative technologies in their products because such products would no longer work with the established standards. When standardized technologies are covered by SEPs, companies that choose to implement the standard are required to practice such patents. Without safeguards in place, SEP holders could demand inflated, discriminatory, and anticompetitive royalties from product manufacturers who have no choice but to use the standard-essential technology. Such abuse of the standard-setting process is called "patent hold-up" and occurs "when the holder of a standard-essential patent ('SEP') demands excessive royalties after companies are locked into using a standard." *Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1209 (Fed. Cir. 2014); *see also* U.S. Dep't of Justice & U.S. Dep't of Commerce, Patent & Trademark Office, *Policy Statement on Remedies for Standard-Essential Patents Subject to Voluntary F/RAND Commitments* (Jan. 8, 2013). Higher royalties are passed on to consumers in the form of higher prices, harming consumers.

6.     To avoid the potential for abuse described above, SSOs require participants claiming to own SEPs to identify and disclose such patents publicly and to promise to offer

licenses to those patents to all implementers of the standard on either royalty-free or fair, reasonable and non-discriminatory ("FRAND") terms. If a patent holder refuses to make such a promise, SSOs generally design the standard without using the patented technology. A FRAND royalty rate is equivalent to the competitive royalty rate that would be negotiated between a licensor and licensee and excludes the supracompetitive premium that an SEP licensor could otherwise charge simply by virtue of being included in the standard.

7.      Wireless communication networks and devices have evolved through four generations of standards: 1G, 2G, 3G, and 4G. There are two main types of 2G and 3G standards called CDMA and GSM/UMTS. The main 4G standard is LTE. Qualcomm induced SSOs to adopt Qualcomm technology within the standard with commitments to license on FRAND terms to all licensees. As a result, Qualcomm holds a number of SEPs related to CDMA and LTE technology.

8.      Chipsets or baseband processors are essential components of cellular devices that enable cell phones and tablets to communicate with wireless networks. Such chipsets are enabled to work with specific wireless standards. Since 2001, Qualcomm has had a monopoly in the CDMA baseband processor market, with consistent market shares above 90% from 2001 to 2014. Since 2012, Qualcomm has also held a monopoly in the premium LTE baseband processor market, with market shares above 90% from 2012 to 2014. In 2015, Qualcomm had an 83% share of the CDMA baseband processor market and a 69% of the premium LTE baseband processor market.

9.      Qualcomm has maintained its monopoly over these products with anticompetitive practices by refusing to license its SEPs on FRAND terms to other baseband processor manufacturers. Qualcomm's anticompetitive refusal to deal violated its contractual commitment to offer its SEPs on FRAND terms to all licensees. The Korean Fair Trade Commission ("KFTC") has found that Qualcomm's own internal documents show that its licensing practices were designed to drive competitor manufacturers out of the market.

10.      Qualcomm's anticompetitive practices have allowed it to maintain its monopoly in the CDMA and premium LTE baseband processor markets. Since 2008, nine of the other 11

ANTITRUST CLASS ACTION COMPLAINT

baseband processor manufacturers have exited the market, even though the market has more than doubled in size. Qualcomm is able to charge inflated prices for CDMA and LTE baseband processors because of its monopoly and those overcharges are passed on to consumers.

11.    Qualcomm further established an anticompetitive "no license-no chips" policy that required cell phone and tablet manufacturers ("OEMs") to separately pay an artificially inflated royalty rate for Qualcomm's SEPs based on the wholesale selling price of the devices (rather than the baseband processors) as a condition of purchasing Qualcomm's baseband processors. Qualcomm refuses to sell baseband processors to OEMs who will not pay Qualcomm's inflated royalty rates and agree to other anticompetitive licensing terms. And Qualcomm has used the threat of reduced supply of baseband processors to ensure that OEMs continue to pay Qualcomm's artificially inflated royalty rates on its SEPs. Qualcomm's "no chips no license" policy chills OEMs from seeking a judicial determination of an appropriate FRAND rate on Qualcomm's SEPs because they cannot risk losing access to Qualcomm's baseband processors.

12.    Qualcomm's anticompetitive practices have enabled it to collect supracompetitive royalties from OEMs and charge monopolistic prices for its baseband processors. Apple alleges that it pays Qualcomm more patent royalties than it pays to all other patent holders on the sale of its cellular devices, even though the other patent holders have greater intellectual property rights related to Apple's products. One study found that Qualcomm received royalties equivalent to 2% of global cell phone sales in 2013 and 2014, while four other comparable companies—each with a similar SEP portfolio—only received between 0.2 and 0.4%. Qualcomm demands a royalty rate of 3.25% on the wholesale price of LTE cell phones and tablets.

13.    Qualcomm also demands and receives royalties on product features that are unrelated to its patents by abusing its monopoly. Qualcomm's royalty rate is calculated based on the final wholesale price of a cell phone or tablet. Apple, for example, sells its iPhone products at several different price points depending on the amount of memory in the device. Qualcomm, however, receives a greater royalty on the higher-memory, higher-priced iPhone models, even though its technology has nothing to do with the added memory that justifies the higher retail price.

14.    Government antitrust agencies have fined Qualcomm more than $2 billion for the anticompetitive practices described herein, and several investigations are still pending. The KFTC fined Qualcomm $208 million in 2009 and $853 million in 2016 for Qualcomm's anticompetitive licensing practices. The Chinese National Development & Reform Commission ("NRDC") fined Qualcomm $975 million in 2015 for its licensing practices relating to SEPs. The Japanese Fair Trade Commission issued a cease and desist order against Qualcomm in 2009 for violating its FRAND obligations. The Taiwanese Fair Trade Commission announced an ongoing investigation into Qualcomm's licensing practices in December 2015. And the European Commission in December 2015 announced two statements of objection against Qualcomm for (1) paying Apple to exclusively purchase baseband chipsets from Qualcomm, stifling competition in the market and (2) pricing baseband processors below cost in order to drive out competitors.

15.    On January 17, 2017, the Federal Trade Commission ("FTC") filed a complaint against Qualcomm for its licensing practices in this Court. *See Fed. Trade Comm'n v. Qualcomm Inc.*, Case No. CV 17-00220 (N.D. Cal. Jan. 17, 2017). The FTC alleges that Qualcomm unlawfully maintained a monopoly in baseband processors and that its actions "raise[d] prices paid by consumers for cell phones and tablets."

16.    In an effort to foil such investigations, Qualcomm withheld approximately $1 billion in rebate payments it owed to Apple in retaliation for Apple's cooperation with the KFTC investigation. Qualcomm offered to release these payments only if Apple submitted revised material to the KFTC that comported with Qualcomm's position.

17.    Broadcom, Nokia, and Icera have sued Qualcomm for its anticompetitive practices. Last week, Apple filed an antitrust action against Qualcomm in the Southern District of California. *See Apple v. Qualcomm Inc.*, No. CV 17-00108 (S.D. Cal. Jan. 20, 2017).

18.    Plaintiff brings this action on behalf of herself and others similarly situated to recover for injuries arising from Qualcomm's violations of Sections 1 and 2 of the Sherman Act, as well as violations of state antitrust and consumer protection laws. Plaintiff seeks monetary damages, injunctive relief, and any other available remedies to which she and the Class Members are entitled.

## II.    THE PARTIES

19.    Plaintiff Sarah Key, who resides in California, purchased an Apple iPhone 6 for personal use and not for resale during the past four years. Plaintiff was injured in fact and has lost money or property as a result of Qualcomm's unlawful and anticompetitive conduct.

20.    Defendant Qualcomm is a Delaware corporation with its principal places of businesses in California located at 5775 Morehouse Drive, San Diego, California 92121. Qualcomm develops, designs, licenses, and markets worldwide its digital communications products and services through two wholly-owned subsidiaries: Qualcomm CDMA Technologies ("QCT"), which handles equipment sales, and Qualcomm Technology Licensing ("QTL"), which licenses patents and other intellectual property rights from Qualcomm's intellectual property portfolio. QCT is operated by Qualcomm Technologies, Inc. ("QTI"), another wholly-owned subsidiary of Qualcomm.

21.    Qualcomm maintains offices and employees and regularly conducts business throughout this District, including in San Francisco, Santa Clara, and Alameda counties.

22.    The true names and capacities, whether individual, corporate, associate, or otherwise, of Defendants sued herein as DOES 1 to 100, inclusive, are currently unknown to Plaintiff, who therefore sues Defendants by such fictitious names.  Plaintiff is informed and believes, and based thereon alleges, that each of the Defendants designated herein as a Doe is legally responsible in some manner for the unlawful acts referred to herein in that they are additional co-conspirators.  Plaintiff will seek leave of court to amend this Complaint to reflect the true names and capacities of the Defendants designated hereinafter as Does when such identities become known. Defendant Qualcomm and the Does 1-100 shall collectively be referred to as "Defendants."

23.    Plaintiff is informed and believes, and based thereon alleges, that each Defendant acted in all respects pertinent to this action as the agent of the other Defendants, carried out a joint scheme, business plan or policy in all respects pertinent hereto, and the acts of each Defendant are legally attributable to the other Defendants.

ANTITRUST CLASS ACTION COMPLAINT

III.    **JURISDICTION AND VENUE**

24.    This Court has jurisdiction over the subject of this action pursuant to 15 U.S. C. §§ 4 and 16, as well as 28 U.S.C. §§ 1331 (federal question) and 1337 (commerce and antitrust regulation).  This Court has supplemental jurisdiction over the state-law claims under 28 U.S.C. § 1367, since the matters at the heart of the Unfair Competition Claims form part of the same case or controversy.

25.    This Court has personal jurisdiction over Qualcomm because it resides in and has its principal place of business in the State of California and substantial parts of the anti-competitive conduct at issue took place in, originated in, or were implemented in whole or in part within the State of California.

26.    Venue is proper in this Court pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. § 1391 because a substantial part of the events giving rise to Plaintiff's claims occurred in this District, and Qualcomm transacts business and maintains facilities in this District and thus is subject to personal jurisdiction here.

27.    Under Local Civil Rule 3-2(c), the intra-district assignment should be to the San Jose Division. This action arises in Santa Clara County because a substantial part of the events giving rise to these claims occurred in Santa Clara County. Qualcomm has offices in Santa Clara and San Jose. Third parties, including various OEMs such as Apple, have offices in Santa Clara County. The FTC filed its case against Qualcomm in the San Jose Division related to the practices at issue in this case.

IV.    **FACTUAL ALLEGATIONS**

A.    **SSOs Standardize Cellular Communication Technology.**

28.    Cell phones and tablets include a semiconductor device known as a chipset, modem, or baseband processor. The baseband processor manages the radio control function of the cellular device, including signal generation, modulation, encoding, and frequency shifting, enabling the cell phone to communicate with a wireless network. The baseband processor must comply with the communications standard that a wireless network uses. Baseband processors that comply with multiple wireless network standards are known as "multi-mode" processors. Multi-

mode processors can communicate with networks that use multiple standards or on different networks using different standards.

29.   SSOs in the wireless communications industry are used to develop technical standards that ensure interoperability and compatibility of products and wireless networks. There are several different SSOs related to wireless communications. The International Telecommunications Union ("ITU") is a worldwide telecommunications SSO comprised of governments and private companies. The Telecommunications Industry Association ("TIA") is the primary U.S. SSO for the communications industry. TIA is composed of telecommunications companies that manufacture or supply products or services in the telecommunications industry. The European Telecommunications Standards Institute ("ETSI") is an independent, non-profit organization based in France that is focused on producing global communication standards. These SSOs and others have developed several generations of cellular communications standards: 1G, 2G, 3G, and 4G.

30.   When the 2G standard was first introduced in the early 1990s, two main standards were developed: (1) the Global System for Mobile Communications ("GSM") and (2) Code Division Multiple Access ("CDMA"). Qualcomm's SEPs constituted a significant portion of the overall set of SEPs for the 2G-CDMA standard. While AT&T and T-Mobile chose to design their networks around the GSM standard, Verizon and Sprint chose the 2G-CDMA standard.

31.   When the 3G series of standards were introduced in the late 1990s, there were two main standards: (1) the Universal Mobile Telecommunications System ("UMTS") and (2) third-generation CDMA ("3G-CDMA"). The UMTS system also incorporated CDMA technology by using "wideband code division multiple access" ("WCDMA") technology. GSM network operators transitioned to the UMTS standard while the 2G-CDMA operators transitioned to the 3G-CDMA standard. Qualcomm had a smaller share of SEPs related to the UMTS and 3G-CDMA standard than its share of the 2G-CDMA SEPs.

32.   The 4G series of standards were first introduced in 2009. 4G standards allow for substantially higher data-transmission speeds than 3G standards. Most major network operators have chosen the Long-Term-Evolution ("LTE") standard. The LTE standard does not rely on

CDMA-based technology. As a result, Qualcomm's share of SEPs related to the LTE standard is much lower than its share of the standards based on CDMA technology. Qualcomm holds a share of SEPs for the LTE standard that is roughly equivalent to that of other industry competitors. One study of declared LTE SEPs found that Qualcomm had a 13% share of "highly novel" essential LTE patents, compared to 19% for Nokia and 12% for Ericsson and Samsung.

33.    In the late 2000s, smartphones that provide advanced computing capability emerged in the marketplace. The launch of Apple's iPhone in 2007 marked an important point in this transition. Smartphones include many features in addition to the cellular connectivity and associated voice and text capabilities provided by earlier phones. Smartphones offer cameras, high-resolution touch-screen displays, powerful applications and graphics processors, and enhanced memory and storage, among other features. Smartphones typically offer connectivity over both cellular networks like 4G-LTE and 3G-CDMA, as well as WiFi networks.

34.    Over time, competition among OEMs has developed across several handset tiers, including premium (sometimes further divided into "premium" and "high"), mid, and low tiers. Premium-tier smartphones, including flagship brands like Apple's iPhone and Samsung's Galaxy-S line, typically include advanced features and technologies. Premium smartphones have become increasingly important to OEMs. Premium smartphones tend to have higher prices and margins than lower-tier products and are important for branding. The United States, where average selling prices for handsets are significantly higher than the global average, is an especially important market of leading OEMs.

35.    Among cellular standards, LTE functionality, including its high data transmission speed, is particularly important for modem smartphones, as consumers increasingly use smartphones to transmit large volumes of data. Cellular data traffic has grown exponentially in recent years, while the volume of cellular voice traffic has remained flat.

36.    The major U.S. cellular network operators have deployed the 4G LTE standard on their networks. These network operators have also continued to use the prior standards. In some areas, network operators have not yet replaced their 2G and 3G infrastructure with the new 4G infrastructure. As a result, U.S. network operators require devices sold for use on their networks

9

to be backward compatible with 2G and 3G standards. Therefore, OEMs must purchase multimode baseband processors in order to make cellular devices that can function on the major U.S. wireless networks.

**B.   Qualcomm Obtains Market Power in Cellular SEPs through Deceptive FRAND Commitments to SSOs.**

37.   Qualcomm belongs to each of the leading SSOs involved in setting wireless communication standards and has made commitments to such SSOs to license its SEPs on FRAND terms. But Qualcomm has repeatedly violated its FRAND commitments by engaging in a variety of anticompetitive licensing schemes that foreclose competitors, charge inflated royalty rates, and ultimately result in overcharges being paid by purchasers of cellular phones like Plaintiff and Class Members.

38.   When standardized technologies are covered by standard-essential patents ("SEPs"), companies that choose to implement the standard are required to practice such patents. Without safeguards in place, SEP holders could demand inflated, discriminatory, and anticompetitive royalties from product manufacturers who have no choice but to use the standard-essential technology. Such abuse of the standard-setting process is called "patent hold-up" and occurs "when the holder of a standard-essential patent ('SEP') demands excessive royalties after companies are locked into using a standard." *Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1209 (Fed. Cir. 2014); *see also* U.S. Dep't of Justice & U.S. Dep't of Commerce, Patent & Trademark Office, *Policy Statement on Remedies for Standard-Essential Patents Subject to Voluntary F/RAND Commitments* (Jan. 8, 2013). Higher royalties are passed on to consumers in the form of higher prices, harming consumers.

39.   Patent "hold-up" can be exacerbated by "over-declaration" of patents as essential to a standard. Patent holders like Qualcomm can claim their patents are SEPs without actually having to prove that they are essential to practicing the standard. Many SSOs state that they do not test declarations of essentiality or validity for accuracy. For example, the European Telecommunications Standards Institute ("ETSI") states that it has "[n]o involvement" in "the assessment of the validity and essentiality of patents declared as SEPs." *Legal Considerations*, ETSI Seminar 2014.

ANTITRUST CLASS ACTION COMPLAINT

40.     These potential abuses of the standard-setting process can be compounded by "royalty stacking," the "payment of excessive royalties to many different holders of SEPs." *See Microsoft Corp. v. Motorola, Inc.*, Case No. C10-1823JLR, 2013 WL 211217, at *11 (W.D. Wash. Apr. 25, 2013).

41.     To avoid the potential for abuse, SSOs require participants claiming to own SEPs to identify and disclose such patents publicly and to promise to offer licenses to those patents to all implementers of the standard on either royalty-free or FRAND terms. If a patent holder refuses to make such a promise, SSOs generally design the standard without using the patented technology. Qualcomm induced SSOs to adopt Qualcomm technology within the standard and then knowingly repudiated its obligation to license its SEPs on FRAND terms.

42.     FRAND royalties must start with an appropriate royalty base and royalty rate, and must also satisfy additional requirements to prevent misuse of the monopoly power conferred by the standard. FRAND royalties must be limited to the actual contribution of the patented technology to the standard rather than (a) the "lock-in" value arising from the standardization of technologies, (b) the value of other technologies incorporated into the standard, or (c) the value of other technologies and standards that make up the consumer device.

43.     An SEP holder that makes a FRAND commitment promises to license its SEPs to any "willing licensee." Such a commitment is an important safeguard against the SEP holder's ability to "hold up" implementers of the standard by refusing to license competitors or customers of competitors, or by licensing competitors or their customers on discriminatory terms that undermine competition.

44.     The FRAND commitment is an important tool to prevent monopoly hold-up and ensure the standard is accessible to all who wish to implement it. *Microsoft*, 2013 WL 2111217, at *11. The FRAND obligation is also a core precondition for antitrust tolerance of the industry collaboration embodied by standard-setting activities. As described by the Third Circuit:

> [A] standard, by definition, eliminates alternative technologies. When a patented technology is incorporated in a standard, adoption of the standard eliminates alternatives to the patented technology. Although a patent confers a lawful monopoly over the claimed invention, its value is limited when alternative technologies exist. That value becomes significantly enhanced, however, after the

1
2
3

patent is incorporated in a standard. Firms may become locked into a standard requiring the use of a competitor's patented technology. The patent holder's IPRs, if unconstrained, may permit it to demand supracompetitive royalties. It is in such circumstances that measures such as FRAND commitments become important safeguards against monopoly power.

4

*Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 314 (3d Cir. 2007) (citations omitted).

5
6
7

45.     Violation of FRAND commitments can include demanding unreasonable royalties, applying royalties in a discriminatory fashion, and asserting that non-essential patents are in fact SEPs. Qualcomm has engaged in all three forms of anticompetitive and unlawful conduct.

8
9
10
11
12
13
14
15

46.     Qualcomm made commitments to European Telecommunications Standards Institute ("ETSI"), Telecommunications Industry Association ("TIA"), the Alliance for Telecommunications Industry Solutions ("ATIS"), and other SSOs that it would license its cellular SEPs for the 2G, 3G, and 4G technological standards on FRAND terms. But, as shown below, Qualcomm has violated its promise to license its cellular SEPs on FRAND terms, refusing to license to competing baseband processor manufacturers at all and using its resulting market power in CDMA and premium LTE baseband processors to compel OEMs to accept non-FRAND licensing terms.

16
17
18

**C.     Qualcomm Acquires and Maintains Monopoly Power in the CDMA and LTE Baseband Processor Markets Through Anticompetitive Conduct.**

1.     Qualcomm Refuses to License to Competing Baseband Processor Manufacturers.

19
20
21
22

47.     Qualcomm's QCT division manufactures Qualcomm's integrated circuit products, including baseband processors. QCT produces baseband processors that are compliant with 2G-CDMA, 3G-CDMA, UMTS, and LTE standards. It also manufactures multi-mode processors that are compliant with multiple standards.

23
24
25
26

48.     Qualcomm's QTL division, by contrast, is responsible for licensing thousands of patents that Qualcomm has declared are essential to the 3G-CDMA, UMTS, and LTE standards. QTL holds a monopoly in the licensing markets for these standards because an OEM must license all SEPs for the standards in order to manufacture devices without infringing.

27
28

49.     While QCT generates most of Qualcomm's revenue, QTL is responsible for the majority of Qualcomm's profits. In 2015, QCT generated $17.5 billion in revenue while QTL generated $7.95 billion. Between 2013 and 2015, QCT was responsible for approximately 70% of

12

Qualcomm's revenue while QTL collected the remaining 30%. But QTL generated the vast majority of Qualcomm's profits—$6.86 billion in earnings before taxes compared with $2.46 billion for QCT.

50.     Qualcomm holds a monopoly position in the CDMA baseband processor market. Between 2001 and 2014, Qualcomm held over a 90% market share in CDMA baseband processors. Qualcomm had a market share of over 80% of this market in 2015. Qualcomm's anticompetitive practices, discussed below, have prevented attempts by competitors like Intel, Texas Instruments, and Eonex to enter this market.

51.     Qualcomm has faced limited competition for the supply of CDMA processors. Over the past decade, the only supplier of CDMA processors other than Qualcomm was Via Technologies, a Taiwan-based company. Via's CDMA processor sales focused on processors used in lower-tier handsets. This is in part because Via has not offered multi-mode processors that combine CDMA functionality with UMTS or LTE functionality. In 2015, Intel Corporation acquired Via's CDMA business. Intel has not yet commercialized a baseband processor product that integrates Via's CDMA technology with Intel's multi-mode processor technologies.

52.     MediaTek Inc., another Taiwan-based company, licensed technology from Via in late 2013, and began to offer CDMA processors in 2015. MediaTek has not offered multi-mode CDMA processors suitable for use in flagship handsets, however, and its sales of CDMA processors have been small.

53.     OEMs have had limited practical alternatives to Qualcomm for the supply of CDMA processors. Qualcomm has used its dominant position to obtain onerous and anticompetitive supply and licensing terms from OEMs.

54.     Most major network operators worldwide have deployed LTE networks, including U.S. operators Verizon, AT&T, T-Mobile, and Sprint. Since its introduction in 2010, LTE functionality has advanced, and the relevant SSOs have released a series of updated standards allowing for progressively faster data speeds. As LTE technology has progressed, baseband processor manufacturers have had to add features to keep up. Today, baseband processors that comply with advanced LTE standards support advanced data download and upload speeds,

13

advanced carrier aggregation and multiple-input multiple-output ("MIMO") capabilities; and advanced power-saving features, among others.

55.   OEMs typically require baseband processors with advanced LTE functionality for premium-tier handsets. For an OEM designing and manufacturing a premium-tier handset, a baseband processor that only supports earlier LTE features is not a reasonable substitute for a baseband processor that supports advanced LTE standards and features.

56.   Competition among manufacturers of LTE baseband processors thus occurs in tiers, including premium (sometimes further divided into "premium" and "high"), mid, and low tiers. A premium LTE baseband processor supports advanced LTE functionality. Qualcomm recognizes that handsets and baseband processors compete in various tiers. Qualcomm's 2016 annual report, for example, refers to both "premium-tier smartphones" and Qualcomm's "premium-tier integrated circuit products."

57.   Qualcomm has consistently been the dominant supplier of premium LTE processors. Between 2012 and 2014, Qualcomm controlled over 80% of this market, and had a 69% share in the market by 2015. Currently, Qualcomm's only competitor in the LTE baseband processor market is Intel. Qualcomm is also the only manufacturer of LTE baseband processors that also include CDMA functionality. This type of baseband processor is necessary for OEMs who manufacture cell phones and tablets that can work on the Verizon and Sprint networks.

58.   Both the CDMA and premium LTE baseband processor markets are protected by high barriers to entry, including (a) the required investment of hundreds of millions of dollars (at least) in R&D; (b) intellectual property licensing requirements; (c) the scale necessary to achieve cost efficiencies; and (d) Qualcomm's exclusionary and anticompetitive conduct.

59.   Qualcomm acquired and maintained its monopoly over CDMA and premium LTE baseband processors by abusing its market power in cellular SEPs, refusing to offer such SEPs on FRAND terms to competing manufacturers. Qualcomm itself acknowledged in a litigation filing that FRAND commitments are supposed to "ensure[] that all industry participants will be able to develop, manufacture and sell products compliant with the relevant standard without incurring the risk that patent holders will be able to shut down those operations."

ANTITRUST CLASS ACTION COMPLAINT

60.     Yet from 1999 to 2007, Qualcomm only offered its cellular SEPs to other baseband processor manufacturers on non-FRAND terms. Since 2008, Qualcomm has simply refused to offer *any* licenses to potential competitor manufacturers despite requests from Intel and Samsung for FRAND licenses.

61.     For example, in April 2006, Broadcom introduced a UMTS baseband processor. Qualcomm asserted to Broadcom and Broadcom's customers that Broadcom did not have a license to Qualcomm's SEPs. Broadcom then attempted to negotiate a license with Qualcomm for its SEPs on FRAND terms. Qualcomm proposed non-FRAND terms to Broadcom and other UMTS chipset manufacturers that prevented them from effectively competing. Qualcomm proposed licensing agreements that ensured a double tax was imposed on OEMs that used non-Qualcomm UMTS chipsets. Qualcomm assessed royalty rates on OEM device manufacturers that included the value of UMTS baseband processors in the overall device unit price even if those chipsets were not manufactured by Qualcomm. Qualcomm also demanded that its UMTS baseband processor manufacturer licensees not sell UMTS baseband processors to OEM device manufacturers that had not licensed Qualcomm's UMTS SEPs. Therefore, Qualcomm ensured that it would receive double royalties, one from the OEM and another from the baseband processor manufacturer on sales of non-Qualcomm UMTS baseband processors. By contrast, Qualcomm allowed OEM device manufacturers to deduct the cost of a Qualcomm-manufactured UMTS chipset from the device unit price. These licensing practices violated Qualcomm's commitment to license on FRAND terms.

62.     Qualcomm also retaliated against competitors that challenged its licensing practices by filing patent infringement lawsuits. In July 2005, Qualcomm filed a patent infringement action against Broadcom ten days after Broadcom had filed an antitrust action against Qualcomm. In November 2005, Qualcomm filed a patent infringement lawsuit against Nokia one week after Nokia filed an antitrust complaint against Qualcomm with the European Commission.

63.     In 2007, Qualcomm claimed publicly that competing manufacturers of CDMA and UMTS/WCDMA chipsets "have to take out a license from Qualcomm" and that Qualcomm had

ANTITRUST CLASS ACTION COMPLAINT

1    been "pretty consistent in that model." In 2007, Qualcomm represented to the United States

2    Supreme Court that it had granted worldwide licenses to competing manufacturers with a running

3    royalty calculated as a percentage of the selling price of the baseband processor. *See* Qualcomm

4    Inc. Br. at 7, *Quanta Computer, Inc. v. LG Elecs., Inc.*, 553 U.S. 617 (2008) (No. 06-937).

5    Qualcomm also claimed in the same filing that its practice of "licensing its intellectual property to

6    entities that produce (non-Qualcomm) chips" was one of its three "primary sources of revenue,"

7    thereby acknowledging it was feasible and efficient to license its SEPs at the component level.

8        64.    Around 2007, Qualcomm began eliminating attempts by other baseband processor

9    manufacturers to license Qualcomm's SEPs. In 2006, Qualcomm's 10-K stated that it entered into

10    "License Agreements" with competing chipset manufactures. By its 2007 10-K, the term

11    "License Agreements" was replaced with "Agreements." By its 2008 10-K, Qualcomm stated that

12    in "every case, these agreements do not allow such integrated circuit suppliers to pass through

13    rights under Qualcomm's patents to such suppliers' customers, and such customers' sales of

14    CDMA-based wireless subscriber devices into which suppliers' integrated circuits are

15    incorporated are subject to the payment of royalties to us in accordance with that customer's

16    separate licensing arrangement with us." Qualcomm's 2014 10-K stated that its policy was to

17    enter into "arrangements," but not exhaustive licenses with competing chipset manufacturers.

18        65.    The KFTC has stated that baseband processor manufacturers Samsung, Intel, and

19    Via have each requested SEP licenses from Qualcomm but have been refused.

20        66.    The FTC alleges that "Qualcomm refuses to license FRAND-encumbered cellular

21    SEPs to competing suppliers of baseband processors, despite its FRAND commitments."

22        67.    A license to Qualcomm's cellular SEPs would provide substantial benefits to other

23    baseband processor suppliers and their customers. Because Qualcomm refuses to license

24    FRAND-encumbered SEPs to its competitors, these competitors cannot offer OEMs baseband

25    processors that convey the rights to Qualcomm's cellular SEPs.

26        68.    The incremental royalty that OEMs pay to Qualcomm also operates as a "tax" that

27    raises OEMs' costs of using baseband processors supplied by Qualcomm's competitors, reduces

28    demand for competitors' processors, and reduces the ability and incentives of competitors to

16

1    invest and innovate. The tax thereby maintains Qualcomm's monopoly power and raises handset

2    prices paid by consumers.

3         69.    When considering handset designs, OEMs consider the all-in cost of a baseband

4    processor, consisting of both (a) the price of the processor and (b) any patent royalties the OEM

5    must pay to use that processor in a handset.

6         70.    Qualcomm's tax, by raising the latter cost component, increases the all-in cost to

7    an OEM of using a competitor's baseband processor, and thus weakens the competitive constraint

8    on Qualcomm's own all-in baseband processor price. By raising OEM's all-in cost of using

9    competitors' baseband processors, the tax diminishes OEMs' demand for those processors and

10   reduces competitors' sales and margins. Qualcomm's "no license-no chips" policy thereby

11   entrenches Qualcomm's monopoly power in the sale of CDMA and premium LTE baseband

12   processors. The policy also reduces competitors' ability to invest and innovate in next-generation

13   technologies.

14        71.    Qualcomm's ability to tax its competitors' sales via patent license terms with

15   OEMs would be limited if it licensed cellular SEPs to its competitors. Qualcomm's competitors,

16   unlike OEM customers, do not depend upon Qualcomm for baseband processor supply. As a

17   result, Qualcomm could not use a threatened disruption in baseband processor supply to skew

18   SEP-license negotiation with its competitors. Instead, Qualcomm simply refused to license its

19   competitors at all.

20        72.    By taxing OEMs for using competitors' baseband processors, Qualcomm has also

21   limited competitors' ability to discipline the all-in price that Qualcomm charges for baseband

22   processors. If Qualcomm used its dominance solely to raise the nominal price of its own

23   processors, those price increases would spur OEMs to seek substitutes and would attract entry and

24   competitive pricing from baseband processor competitors. By contrast, imposing a tax—which

25   OEMs must pay regardless of whether they use baseband processors supplied by Qualcomm or

26   Qualcomm's competitors—enables Qualcomm to raise the all-in prices of processors without

27   spurring substitution or attracting entry.

28

ANTITRUST CLASS ACTION COMPLAINT

73.    By refusing to license its SEPs to competing baseband processor manufacturers, Qualcomm drove such competitors out of the market and thereby acquired and maintained its monopoly position in CDMA and LTE baseband processors.

74.    In 2008, Deutsche Bank identified 11 major manufacturers of baseband processors. Since 2009, the baseband processor market has grown from approximately $10 billion to over $20 billion in revenue. Yet since 2008, nine of the major chipset manufacturers have exited the market and none have entered. According to the KFTA, the Herfindahl-Hirschman index for the baseband processor market has increased from 2,224 in 2008 to 4,670 in 2014. The 4G LTE baseband processor market has gone from moderately concentrated to extremely concentrated in the same period of time. The KFTC prepared the following chart showing Qualcomm's success in driving competitors from the baseband processor market:



&lt;Market Growth Trend in the Modem Chipset Market and Market Exit by Major Chipset Companies&gt;

| Modem Chipset Maker | Exit (Imminent) Time |
|---|---|
| NXP | August 2008 |
| TI | October 2008 |
| Freescale | October 2008 |
| ST Micro | February 2012 |
| NEC | February 2014 |
| Broadcom | June 2014 |
| Ericsson | September 2014 |
| Nvidia | May 2015 |
| Marvell | September 2015 |

2.    Qualcomm Abuses Its  Monopoly in Baseband Processors to Preclude OEMs from Challenging Anticompetitive Licensing Terms.

75.    Having acquired and maintained its monopoly in CDMA and premium LTE baseband processors, Qualcomm conditions OEM's access to its baseband processors on acceptance of a license to Qualcomm's cellular SEPs on Qualcomm's preferred terms—a policy the FTC has referred to as Qualcomm's "no license-no chips" policy.

76.    As alleged below, the "no license-no chips" policy is exclusionary. The policy skews Qualcomm's license negotiations with OEMs toward outcomes that raise the all-in prices that OEMs must pay on both Qualcomm baseband processors and those supplied by Qualcomm's competitors. These higher all-in prices reduce demand for competitors' processors and raise handset prices paid by consumers.

ANTITRUST CLASS ACTION COMPLAINT

1    77.    The FTC alleges that Qualcomm's "no license-no chips" policy is unique among

2    suppliers of semiconductor and cellular-equipment components. Other component suppliers rely

3    on component sales to convey their intellectual property rights to OEM customers, rather than

4    selling the components and also entering into a separate intellectual property license.

5    78.    Indeed, when a supplier sells a component like a baseband processor to an OEM,

6    the doctrine of patent exhaustion provides that such a sale ordinarily terminates any right of the

7    supplier to control any further use or sale of the component. *Quanta Computer, Inc. v. LG Elecs.,*

8    *Inc.*, 553 U.S. 617, 638 (2008). Thus, when one of Qualcomm's competitors sells a baseband

9    processor to an OEM, the OEM can use or resell the processor without obtaining a separate patent

10   license from the competitor—just as a consumer buying a smartphone does not have to obtain a

11   separate patent license from the seller of the smartphone.

12   79.    The FTC further alleges that Qualcomm's "no license-no chips" policy sets

13   Qualcomm apart from other licensors of SEPs. Normally, if an SEP licensor and a potential

14   licensee cannot agree on FRAND terms, then either side will initiate litigation that will result in

15   the Court determining the FRAND royalty rate. These suits, when litigated to judgment, have

16   produced royalty rates far below the SEP licensor's original demands. For example, Motorola, an

17   SEP licensor, initially demanded that Microsoft pay SEP royalties of $6-$8 for every Xbox sold,

18   but the court ultimately set the FRAND rate at $0.04 per Xbox. *See Microsoft Corp. v. Motorola,*

19   *Inc.*, Case No. C 10-1823, 2013 WL 2111217, at *99-101 (W.D. Wash. Apr. 25, 2013).

20   80.    OEMs regard Qualcomm's royalties as non-FRAND. Absent Qualcomm's "no

21   license-no chips" policy, such OEMs would have the ability and incentive to challenge

22   Qualcomm's royalty demands in court. For example, OEM's could challenge Qualcomm's

23   royalty demands as being non-FRAND on several grounds, including that:

24   a.    Qualcomm's royalties are disproportionately high relative to the value

25         contributed by its patented inventions, and often are several times higher than the

26         royalties of other SEP licensors that have made similar technical contributions;

27   b.    Qualcomm has continued to calculate royalties as a percentage of the

28         handset's price, even though handsets today offer a number of features—including

19

cameras, high-resolution touch-screen displays, powerful applications, and graphics processors—other than cellular connectivity;

c.    Qualcomm's standard royalty rate has not fallen, even though many of Qualcomm's SEPs related to CDMA technology have expired; and

d.    Qualcomm has required OEMs to grant Qualcomm cross-licenses, often with pass-through rights to other OEMs, and has failed to adjust the royalty rate to account for the value of the OEM's cross-licensed patents.

81.    Qualcomm's "no license-no chips" policy has effectively prevented OEMs from challenging Qualcomm's royalty demands on these and other grounds by dramatically increasing OEMs' costs of going to court. Rather than simply facing attorney's fees and other litigation costs, OEMS must also fear loss of access to Qualcomm's baseband processors.

82.    Loss of access to Qualcomm's processors imposes substantial costs on OEMs. Given Qualcomm's dominant position in the supply of CDMA and premium LTE processors, an OEM unable to purchase such processors from Qualcomm would be severely hampered in efforts to design and sell critically important premium-tier phones and phones for use on CDMA networks.

83.    Starting in 2001, Qualcomm used the threat of artificial shortages in the supply of CDMA baseband processors to discipline OEMs. Qualcomm threatened OEMs with the loss of various Qualcomm services if the manufacturers purchased baseband processors from Qualcomm competitors.

84.    On April 22, 2004, Qualcomm's President was quoted as describing baseband processors as "very much a supply limited market" and stating that a wireless carrier had been "constrained by the number of phones they can get."

85.    Throughout 2012, there was a significant shortage in Qualcomm's supply of LTE baseband processors. This shortage increased Qualcomm's market power and allowed it to demand inflated royalty rates on its patent portfolio.

86.    In 2016, LG Electronics initiated arbitration against Qualcomm because of Qualcomm's unfair demands during patent licensing negotiations. Qualcomm and LG eventually

ANTITRUST CLASS ACTION COMPLAINT

reached a settlement in which Qualcomm agreed to increase its supply of baseband processors to LG.

87.    Absent Qualcomm's dominance in CDMA and premium LTE baseband processors, an OEM could protect itself against a supply disruption either (a) by substituting non-Qualcomm processors in the new handset designs or (b) by using the prospect of substitution to negotiate supply terms with Qualcomm that protect the OEM from disruption. Qualcomm has prevented the former by refusing to license its competitors on FRAND terms or at all, thereby driving them from the market. And it has also prevented the latter by using its market power to force OEMs like Apple to accept supply terms that leave them vulnerable to a supply disruption in the event of a license dispute. For example, Qualcomm used its market power as leverage to require Apple to accept unreasonable contract terms, including the fact that Qualcomm refused to guarantee Apple a supply of chipsets and arbitrarily limited its liability for failure to supply chipsets.

88.    Qualcomm's "no license-no chips" policy has significantly influenced the course of license negotiations with a number of OEMs, including Apple. To maintain access to Qualcomm's baseband processors, OEMs have accepted royalty and other license terms that they would not otherwise accept. As a result of the "no license-no chips" policy, the royalties that OEMs pay Qualcomm on handsets using non-Qualcomm baseband processors do not reflect OEMs' assessment of patent royalties that a court or neutral arbiter would deem reasonable, including in light of Qualcomm's FRAND commitments. Instead, the royalties reflect Qualcomm's dominant position in baseband processors, and include the added increment that OEMs pay to Qualcomm to avoid disruption of processor supply.

    3.    <u>Qualcomm Abuses its Market Power to Extract Baseband Processor Exclusivity and Other Anticompetitive Licensing Terms from Apple.</u>

89.    Apple manufactures iPhones and iPads and is one of the largest purchasers of baseband processors in the world. Apple employs contract manufacturers that assemble iPhones and iPads and who, in turn, pay patent royalties to Qualcomm, passing the cost along to Apple.

90.    Apple repeatedly engaged in negotiations with Qualcomm concerning the excessive royalties Qualcomm charged such contract manufacturers to license its SEPs.

21

Qualcomm refused to negotiate SEP royalty rates for licenses directly with Apple, instead giving Apple rebates, discounts, and other incentives to ensure Apple would continue to use Qualcomm's baseband processors. Qualcomm also required that Apple's contract manufacturers keep their license agreements with Qualcomm secret, preventing Apple from determining how much in royalties Qualcomm was charging.

91.    In 2007, Qualcomm agreed to give Apple a rebate of all royalties Qualcomm received from Apple's contract manufacturers over a specified per-unit cap. Apple, in turn, agreed not to incorporate the proposed 4G WiMax cellular standard that Intel advocated and Qualcomm opposed. That action helped ensure the adoption of the 4G LTE standard that contained a higher percentage of Qualcomm's SEPs.

92.    In 2011, Qualcomm and Apple entered into a new agreement. Qualcomm agreed to make substantial incentive payments to Apple if Apple agreed to exclusively use Qualcomm baseband processors in all new iPhone and iPad models. Apple would forfeit all of these incentive payments if it used any non-Qualcomm baseband processors.

93.    This agreement was modified in 2013 so that it would continue through 2016. In the 2013 modification, however, Qualcomm insisted on a new condition: Apple could neither initiate nor induce others to initiate litigation that Qualcomm had failed to offer licenses on FRAND terms. Qualcomm also agreed to make separate substantial incentive payments to Apple so long as Apple exclusively sourced baseband processors from Qualcomm. If Apple launched a new device with a non-Qualcomm baseband processor, it would forfeit past and future incentive payments. Even with rebates, Apple paid Qualcomm a higher amount in royalties than it collectively paid to other licensors who together owned a far higher percentage of the SEPs for the 4G standard.

94.    Qualcomm also used its market power as leverage to make Apple accept unreasonable and anticompetitive licensing terms. Qualcomm refused to guarantee Apple a supply of chipsets, arbitrarily limited its liability for failure to supply chipsets, and forced Apple to cross-license its own patents to Qualcomm or other Qualcomm licensees. Apple itself stated in its lawsuit filed last week that "[f]or several years, Qualcomm's actions deterred Apple from

22

1  switching to Qualcomm's or other potential competitors' chipsets, substantially diminishing
2  competition in the interim."

3        95.    Qualcomm's 2011 and 2013 agreements with Apple were, and were intended by
4  Qualcomm to be, *de facto* exclusive deals that were as effective as express purchase requirements
5  and that essentially foreclosed Qualcomm's competitors from gaining baseband processor
6  business at Apple, since:

7                a.    Apple had at all relevant times an interest in developing and working with
8                      additional suppliers of baseband processors.

9                b.    The large penalties Apple would face under its agreements with Qualcomm
10                     if it sourced baseband processors from another baseband supplier prevented Apple
11                     from using alternative suppliers during the effective exclusivity period under these
12                     agreements.

13               c.    Although a price-cost test is not required to assess the competitive effects
14                     of Qualcomm's agreements with Apple, the penalties under these agreements are
15                     sufficiently large that, if they were attributed as discounts to the price of
16                     Qualcomm baseband processors reasonably contestable by a Qualcomm
17                     competitor, the resulting price of Qualcomm's processors would be below
18                     Qualcomm's cost.

19       96.    As a result of the exclusivity terms in its agreement with Qualcomm, Apple
20 sourced baseband processors exclusively from Qualcomm for all new iPads and iPhone products
21 that it launched over the five-year period from October 2011 through September 2016.

22       97.    Qualcomm's exclusive deal with Apple excluded competition from other baseband
23 processor suppliers and harmed competition. Apple is a particularly important OEM from the
24 perspective of a nascent baseband processor supplier and confers benefits on a nascent supplier
25 that make the supplier a stronger contender for other OEMs' business:

26               a.    Apple sells large volumes of premium handsets that require premium LTE
27                     baseband processors. These processors ordinarily command higher prices and
28

1    margins than lower-tier baseband processors. Supplying Apple helps a nascent

2    supplier achieve a scale of business that confers R&D flexibility.

3        b.    A nascent supplier learns directly from engagement with Apple

4    engineering teams and this engagement improves the supplier's baseband

5    processor offerings.

6        c.    A nascent supplier achieves technical validation by demonstrating its

7    ability to meet Apple's demanding technical requirements.

8        d.    A nascent supplier engaged by Apple can field-test its processors through

9    global launches that require real-world work with network operators and

10    infrastructure vendors.

11    98.    Qualcomm's exclusive agreements with Apple prevented Qualcomm's competitors

12    from attaining these benefits during the term of the exclusivity period. These agreements also

13    foreclosed a substantial share of the market for premium LTE baseband processors. The

14    agreements significantly impeded the development of other baseband processor suppliers into

15    effective competitors to Qualcomm.

16        **D.    Qualcomm Has Monopoly and Market Power in Relevant Markets.**

17    99.    The relevant geographic market is the United States and its territories. There are

18    no material geographic barriers to competition for baseband processor sales.

19    100.    The relevant product markets are (1) CDMA compliant baseband processors; (2)

20    premium LTE compliant baseband processors; and (3) licensing rights for SEPs included in the

21    3G and 4G cellular standards (the "SEP licensing market").

22    101.    As set forth above, Qualcomm has monopoly power with respect to CDMA

23    baseband processors and premium LTE baseband processors. Direct evidence of this power

24    includes evidence of Qualcomm's ability to use threatened loss of access to baseband processors

25    to raise the all-in prices of baseband processors, including both the nominal price of the

26    processors as well as license fees for Qualcomm's intellectual property.

27    102.    Qualcomm's monopoly and market power is also established through

28    circumstantial evidence, including dominant shares of relevant market with substantial barriers to

24

entry. Baseband processors without CDMA functionality are not close enough substitutes to prevent Qualcomm from raising all-in prices for CDMA processors. Similarly, baseband processors without premium LTE functionality are not close enough substitutes to prevent Qualcomm from raising all-in prices for premium LTE processors.

103. Qualcomm has had a monopoly in the CDMA baseband processor market, with consistent market shares above 90% from 2012 to 2014. Since 2012, Qualcomm has also held a monopoly in the premium LTE baseband processor market, with market shares above 90% from 2012 to 2014. In 2015, Qualcomm had an 83% share of the CDMA baseband processor market and a 69% of the premium LTE baseband processor market. On information and belief, Qualcomm held similar market shares in 2016.

104. Barriers to entry in such markets are significant, including the need to make substantial, costly, and time-consuming investments in technology R&D; the need to develop ongoing customer relationships with leading OEMs; certification requirements imposed by network operators; and barriers to entry that Qualcomm itself has erected with its anticompetitive scheme, including the effective tax that Qualcomm imposes on the baseband processor sales of competitors and potential competitors and Qualcomm's refusal to license its FRAND-encumbered SEPs to competitors.

105. Qualcomm also directly participates in product markets for (1) CDMA compliant cell phones, (2) premium LTE cell phones, and (3) CDMA and premium LTE tablets because it manufactures baseband processors that are used in such cellular devices and imposes licenses on all manufacturers of cellular devices regardless whether they use Qualcomm baseband processors. The cellular device product markets are inextricably intertwined with the CDMA and premium-LTE baseband processor markets and the SEP licensing market, as shown by the fact that (1) Qualcomm uses its market power in baseband processors to extract anticompetitive licensing terms for its SEPs, (2) such licensing terms include charging a separate royalty as a percentage of the wholesale price of the cellular device rather than the baseband processor, and (3) such a royalty directly inflates the price of the cellular device purchased by consumers like Plaintiff and other members of the putative Class(es).

ANTITRUST CLASS ACTION COMPLAINT

E. **Qualcomm's Conduct Has Harmed Competition in the Relevant Markets and Caused Consumers to Pay Supracompetitive Prices for Cellular Devices.**

106. Qualcomm's anticompetitive practices have excluded competitors, suppressed innovation, and increased consumer prices.

107. By raising OEMs' all-in cost of using competitors' baseband processors, Qualcomm's conduct has diminished OEMs' demand for such processors, reduced competitors' sales and margins, and diminished competitors' ability and incentive to invest and innovate.

108. Several former competitors of Qualcomm have sold off or shut down their baseband processor businesses, unable to achieve sales volumes and margins needed to sustain a viable business. While Intel and MediaTek have remained in the business, these firms have felt significant pressure, including on baseband processor margins.

109. Qualcomm's practices also suppress innovation, including by foreclosing competing manufacturers and by demanding what amounts to a royalty-free cross-license from its OEM customers, which reduces incentives for such OEMs to innovate.

110. Qualcomm's demand that OEMs license its entire patent portfolio prevents OEMs from determining whether or not specific Qualcomm patents actually need to be licensed—either because the OEM product does not actually infringe or the patent is invalid. Qualcomm has resisted attempts by OEMs to license its specific SEPs on FRAND terms. In April 2016, Apple attempted to license the specific patents that Qualcomm considered to be SEPs for the 3G and 4G standards. Qualcomm refused to negotiate over specific patents and removed from its website the list of patents that it had disclosed to ETSI as SEPs for the 3G and 4G standards.

111. Qualcomm's demand for a royalty rate based on the entire wholesale price of the phone or tablet is also evidence of its unlawful exercise of monopoly power, when compared to other technology companies whose business model depends on licensing SEPs. ARM Holdings ("ARMH") holds a large number of SEPs related to the 802.11 wireless standards, which is incorporated into a wide variety of devices that have wireless networking features. But unlike Qualcomm, ARMH charges a royalty rate based on the price of the specific chips that rely on ARMH's SEPs. For example, Marvell, a chipset manufacturer, uses ARMH's SEPs in wifi chipsets it produces that are incorporated into Microsoft Xbox. ARMH charges a 1% royalty rate

ANTITRUST CLASS ACTION COMPLAINT

that is calculated off the price of Marvell's chipset, rather than the cost of the overall Xbox product. Qualcomm, by comparison, charges a royalty rate of 3-5% based of the overall wholesale cost of a device, which is usually in the hundreds of dollars, even though its baseband processors sell by themselves for between $10-20. Qualcomm's anticompetitive practice causes overcharges to OEMs (and ultimately consumers) who offer feature-rich phones or tablets at higher selling prices.

112.    By contrast, while Apple's four other largest direct licensors for wireless communications SEPs hold a significantly higher percentage of 4G SEPs than Qualcomm's self-declared 23.5%, but Qualcomm's anticompetitive practices allow it to charge higher royalties to Apple than the other four companies combined.

113.    Qualcomm received approximately 2% of total worldwide cell phone sales in royalties in 2013 and 2014, collecting licensing revenues of approximately $7.8 billion. Four other companies with similar SEP portfolios—Alcatel-Lucent, Ericsson, InterDigital, and Nokia—collected a combined total royalty rate of only approximately 0.7% of total cell phone sales and $2.7 billion in licensing revenue.

114.    Qualcomm's monopolistic and anticompetitive behavior harmed Plaintiff and other members of the putative Class(es) because it caused them to pay higher prices for device products than they would have otherwise paid. The entire overcharge for cellular devices was passed on to members of the proposed Class(es). Qualcomm's practices are not reasonably necessary to accomplish any significant procompetitive benefits. The anticompetitive harm from those practices outweighs any procompetitive benefits, and Qualcomm could reasonably achieve any procompetitive goals through less restrictive alternatives.

115.    Baseband processors are commodity products, which share standard specifications. Baseband processors are incorporated into cellular devices, which are also commodity products that share standard specifications. Consumers like Plaintiff purchase stand-alone devices. Qualcomm's baseband processors are clearly identifiable as incorporated into specific cellular devices. Qualcomm also receives a specified, inflated royalty rate on the wholesale price of the specific cellular device. This royalty rate is clearly identifiable for specific device types.

ANTITRUST CLASS ACTION COMPLAINT

116.    Indirect purchasers like Plaintiff purchase cellular devices from one of two distribution chains: (1) a cell phone OEM or (2) a reseller, such as a retailer or wireless network. Thus, Qualcomm's revenues from baseband processors and SEPs follow a traceable chain from Qualcomm to the consumer.

117.    The OEM and retail markets for cellular devices are subject to vigorous price competition. OEMs and retailers have thin net margins and are at the mercy of their component costs. Increases in the price of baseband processors and royalty rates for SEPs lead to corresponding price increases at the OEM and retailer levels for cellular devices.

118.    SEP royalty rates and baseband processors make up a substantial portion of the cost of manufacturing cellular devices. The retail price of a device is determined in substantial part by the cost of the baseband processors and of the associated SEPs.

119.    As a result, the inflated prices of cellular devices resulting from Qualcomm's anticompetitive practices have been passed on to Plaintiff and other members of the proposed Class(es) by direct-purchaser manufacturers, distributors, and retailers.

120.    Economic theory teaches that the only situations in which precisely zero pass through occurs is when an industry faces a perfectly elastic demand for its product, or if supply was perfectly inelastic. These possibilities are considered implausible by economists. Either scenario is at odds with the nature of the device industries. Existing empirical studies of the electronics industry have concluded that demand is not infinitely elastic. Therefore, at least a partial pass-through of an increase in the costs of SEP licenses and baseband processors into the price of cellular devices—and consequent harm to Plaintiff and members of the putative Class(es)—is the predicted outcome of successful monopolistic and anticompetitive behavior.

121.    To the extent that distributors, wholesalers, and retailers selling to consumers or to others in the distribution chain price their sales as their cost plus a fixed markup, this will create an additional reason for pass through to exceed 100 percent through these channels. For example, if a wholesaler prices its product at manufacturer sales price plus 10 percent, and a retailer prices its product at wholesale plus 10 percent, the total pass through to the final consumer will be 121 percent (i.e., 110 percent times 110 percent) of manufacturer sales price. Further, because

28

retailers ultimately compete with direct sales to purchasers by device manufacturers, competitive forces would likely work to equalize end-purchaser prices between channels, after controlling for the value of differences in support across different distribution channels. This would tend to push the total pass-through rate from costs to end-purchaser pricing above 100 percent, since manufacturers could not sustain a pricing policy to distributors that did not cover their costs, and an additional fixed markup on top of distributor costs would result in a total pass-through rate to final consumers in excess of 100 percent. Based on economic theory and published studies in this area, it is likely that the pass-through rates of inflated costs on both baseband processors and SEP licenses into cellular devices will exceed 100 percent, a situation known as "overshifting."

122. Thus, Plaintiff and other members of the proposed Class(es) have been forced to pay supracompetitive prices for cellular devices. These inflated prices have been passed on to them by direct purchaser manufacturers, distributors, and retailers.

## V.    CLASS ACTION ALLEGATIONS

123. Plaintiff brings this case on behalf of herself and as a class action under Federal Rule of Civil Procedure 23(b)(2) and 23(b)(3) on behalf of all members of the following Class (the "Nationwide Class"):

> All natural persons and entities in the United States who purchased, paid, and/or provided reimbursement for some or all of the purchase price for CDMA and/or premium LTE cellular devices ("Relevant Cellular Devices") from January 26, 2017, through the present (the "Class Period"). This class excludes (a) Defendant, its officers, directors, management, employees, subsidiaries, and affiliates; (b) all federal and state governmental entities except for those who have purchased Relevant Cellular Devices; (c) all persons or entities who purchased Relevant Cellular Devices for purposes of resale or directly from Defendant; and (d) any judges or justices involved in this action and any members of their immediate families or their staff.

124. In the event California law is not applied to the claims of all Class Members for damages regardless of where they reside, Plaintiff will seek certification of the following Subclass under Rule 23(b)(3) for damages, under California law or, alternatively, the respective laws of each *Illinois Brick* repealer state named therein, in addition to certification of the Class under Rule 23(b)(2) for purposes of injunctive relief (the "Nationwide Repealer State Class"):

29

All natural persons and entities residing in the United States who purchased in Arizona, California, the District of Columbia, Florida, Kansas, Massachusetts, Minnesota, New Mexico, New York, Tennessee, or Vermont who purchased, paid, and/or provided reimbursement for some or all of the purchase price for CDMA and/or premium LTE cellular devices ("Relevant Cellular Devices") from January 26, 2017, through the present (the "Class Period"). This class excludes (a) Defendant, its officers, directors, management, employees, subsidiaries, and affiliates; (b) all federal and state governmental entities except for those who have purchased Relevant Cellular Devices; (c) all persons or entities who purchased Relevant Cellular Devices for purposes of resale or directly from Defendant; and (d) any judges or justices involved in this action and any members of their immediate families or their staff.

125.    The Nationwide Class and the Nationwide Repealer State Class are referred to as the "Classes."

126.    Plaintiff does not currently know the exact number of the members of the Classes, but believes that they number in the millions.

127.    Common questions of law and fact exist as to all members of the Classes and predominate over any individualized issues or questions. Such common questions of law and fact include but are not limited to:

a.    Whether Qualcomm possessed monopoly power over CDMA and premium LTE baseband processors in the United States during the Class Period;

b.    Whether Qualcomm willfully acquired or maintained monopoly power over the CDMA and premium LTE baseband processors in the United States during the Class Period;

e.    Whether Qualcomm possessed or attempted to possess monopoly power in the SEP Licensing Market in the United States during the Class Period;

f.    Whether Qualcomm willfully acquired or maintained monopoly power over the SEP Licensing Market in the United States during the Class Period;

g.    Whether Qualcomm tied the sale of its CDMA and premium LTE baseband processors to the purchase of license rights to its patent portfolio (including SEPs and non-SEPs);

h.      Whether Qualcomm's unlawful conduct enabled Qualcomm to increase, maintain, or stabilize above competitive levels the prices it charges for patent licenses on its cellular SEPs and the prices it charges for its CDMA and LTE baseband processors;

i.      Whether such inflated prices were passed on to Class Members and, if so, the appropriate classwide measure of damages;

j.      Whether Qualcomm's acquisition and maintenance of its monopoly in the CDMA and premium-LTE baseband processor markets violated Section 2 of the Sherman Act;

k.      Whether Qualcomm's anticompetitive licensing agreements with OEMs constitute unreasonable contracts in restraint of trade or commerce in violation of Section 1 of the Sherman Act;

l.       Whether Qualcomm's conduct violated the Cartwright Act, Cal. Bus. & Prof. Code §§ 16700, *et seq.*;

k.      Whether Qualcomm's conduct violated state antitrust and unfair competition laws, and/or state consumer protection laws;

m.      Whether Qualcomm unjustly enriched itself to the detriment of the Plaintiff and members of the Classes, thereby entitling Plaintiff and members of the Classes to disgorgement of all benefits derived by Qualcomm;

n.      Whether Qualcomm's conduct caused injury to the business or property of Plaintiff and members of the Classes;

o.      The effect of Qualcomm's unlawful conduct on the prices of Relevant Cellular Devices sold in the United States and its territories during the Class Period;

p.      The appropriate injunctive and related equitable relief for the Nationwide Class; and

q.      The appropriate class-wide measure of damages for the Nationwide Repealer State Class.

31

128.    Plaintiff's claims are typical of the claims of the members of the Classes, and Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff and all members of the Classes are similarly affected by Qualcomm's wrongful conduct in that they paid supracompetitive prices for cellular phones.

129.    Plaintiff's claims and those of the members of the Classes arise from the same common course of conduct. Plaintiff's interest coincide with, and are not antagonistic to, the interests of other members of the Classes. Plaintiff is represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

130.    The questions of law and fact common to members of the Classes predominate over any questions affecting only individual members, including any individual legal and factual issues relating to liability and damages.

131.    Class action treatment is a superior method for the fair and efficient adjudication of the controversy because (a) it will avoid a multiplicity of suits and consequent burden on the courts and Qualcomm; (b) it would be virtually impossible for all members of the Classes to intervene as parties-plaintiffs in this action; (c) it will allow numerous individuals with claims too small to adjudicate on an individual basis because of the prohibitive cost of this litigation to obtain redress for economic injuries; and (d) it will provide court oversight of the claims process, once Qualcomm's liability is adjudicated.

132.    This case is also appropriate for certification as a class action because Qualcomm and its co-conspirators have acted and refused to act on grounds generally applicable to the Classes, so that final injunctive relief will be appropriate with respect to the Classes as a whole.

133.    The claims asserted herein are also appropriate for class certification under the laws of the state of California.

### FIRST CLAIM FOR RELIEF

**(For Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2)**

134.    Plaintiff incorporates by reference the allegations in the above paragraphs as if fully set forth herein.

135.    Qualcomm's conduct, as alleged herein, constitutes unlawful monopolization of the market for Cellular Device Components, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

136.    Qualcomm has monopoly power in the CDMA and premium-LTE baseband processor markets. First, it has maintained high and durable market shares in these markets. Qualcomm controls the CDMA chipset supply, historically controlling over 90% of the CDMA baseband processor market and at the lowest point still controlling 83% of this market. Qualcomm also controls the premium LTE baseband processor market, controlling at all relevant times up to 90% of the market, and today over 60% of the market. Qualcomm still exclusively supplies CDMA-LTE chipsets that are backward compatible with CDMA.

137.    There are substantial barriers to entry. CDMA and premium LTE based technology is not interchangeable with or substitutable for other technologies, and adherents of such technologies have become locked-in. Qualcomm also controls the SEPs underlying CDMA technology, and Qualcomm has maintained this monopoly by, among other things, refusing to license to competitors and requiring purchasers of its chipsets to agree to license its patent portfolio. Third, Qualcomm's monopoly power is shown by its demonstrated ability to force device manufacturers to accept one-sided, unreasonable supply terms. Among other things, Qualcomm has used its control over the CDMA baseband processor supply to require purchasers to agree to its license agreements and related terms, including exclusively high royalty terms.

138.    Qualcomm also has monopoly power over the SEP Licensing Market. SSOs have selected standards based on technology for which Qualcomm owns the patents, based on the condition that Qualcomm would license such technology on FRAND terms. Qualcomm holds virtually all of the SEPs for CDMA standard-based technologies, which underlie virtually all 3G devices and 4G-LTE devices which are 3G compatible. As these patents are essential to the CDMA standard, other patents and patented technology are not substitutes. Qualcomm's market power over the SEP Licensing Market is further demonstrated by Qualcomm's ability to leverage its control of its patents to force OEMs to agree to unfair and unreasonable license agreements and terms, including excessive royalties. Because OEMs need to use Qualcomm's technology for

33

their devices to communicate with the major carrier networks, they are forced to agree to Qualcomm's unfair and unreasonable licensing terms.

139.    Qualcomm has acquired and maintained its market power described above through anticompetitive means—among other things, excluding competitors and forcing OEMs to agree to non-FRAND terms.

140.    Qualcomm's market power over CDMA and premium-LTE baseband processors and SEP Licensing allows it to encumber Relevant Cellular Devices with supracompetitive and inflated royalties without other firms competing to drive down those prices. Specifically, Qualcomm's control over baseband processors has allowed it to force license agreements on OEMs that allow Qualcomm to charge a licensing fee plus ongoing royalties of between 3-5% of the wholesale price of the completed cellular phone. In other words, each Relevant Cellular Device sold with or based on Qualcomm technology is also encumbered by Qualcomm's excessive royalties, which, in turn, increase the cost of the device for consumers like Plaintiff and Class Members.

141.    There is no procompetitive justification for the anticompetitive conduct in which Qualcomm has engaged. Qualcomm induced SSOs to use its technology and related patents in setting their standards on the promise that it would adhere to FRAND obligations. In doing so, other alternative (and potentially superior) technologies were not utilized by SSOs. But Qualcomm has not met its FRAND obligations. Instead, it has abused its monopoly power in the Cellular Device Components to force OEMs into licenses with unfair and unreasonable terms, including, but not limited to, excessively high royalty rates based on the selling price of the completed device rather than the value of Qualcomm's contribution to the technology in that device. Qualcomm's acts have harmed the development of cellular telephone technology, as it has forced out competitors, thus reducing innovation and competitive pricing.

142.    Plaintiff and Class Members were harmed by Qualcomm's conduct, which increased the purchase price of their Relevant Cellular Devices. Additionally, Qualcomm's conduct harmed innovation and foreclosed competition, which harmed Plaintiff and Class Members in the quality and price of their Relevant Cellular Devices.

**SECOND CLAIM FOR RELIEF**

**(For Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1)**

143.    Plaintiff incorporates by reference the allegations in the above paragraphs as if fully set forth herein.

144.    Qualcomm, by and through their officers, directors, employees, agents or other representatives, along with the co-conspirators referenced herein have entered into unlawful agreement(s), combination(s) and conspiracies in restraint of trade, in violation of 15 U.S.C. § 1. Such agreements include Qualcomm's anticompetitive agreements with Apple in 2011 and 2013, as well as agreements with OEMs pursuant to Qualcomm's "no license-no chips" policies, pursuant to which Qualcomm exacts anticompetitive, non-FRAND royalties from OEMs based on the wholesale price of cellular devices. Such conduct is actionable under the private attorney general provisions for civil litigants under the Clayton Act.

145.    These conspiratorial acts, combinations, and agreements have caused unreasonable restraints in the markets for CDMA baseband processors, premium LTE baseband processors, SEP Licensing, and Relevant Cellular Devices, without countervailing and offsetting pro-competitive benefits.

146.    Plaintiff and the other Class Members have been harmed by injury to competition in these markets and by being forced to pay inflated prices for Relevant Cellular Devices.

147.    Plaintiff seeks the relief set forth below and in this cause of action seeks such relief on behalf of herself and all Class Members against Qualcomm.

**THIRD CLAIM FOR RELIEF**

**(For Violation of the Cartwright Act, Cal. Bus. & Prof. Code §§ 16700, *et seq.*)**

148.    Plaintiff incorporates by reference the allegations in the above paragraphs as if fully set forth herein.

149.    During the Class Period, Qualcomm engaged in monopolistic and anticompetitive conduct in unreasonable restraint of trade and commerce and in violation of California Business and Professions Code section 16700, *et seq.* Qualcomm engaged in anticompetitive agreements and combinations in restraint of trade with its OEM licensees, as such agreements violated

35

1  Qualcomm's FRAND commitments, included supracompetitive royalty rates, and excluded
2  alternate technologies.

3      150.    The Relevant Cellular Devices are commodities.

4      151.    As a direct result of Qualcomm's unlawful conduct, Plaintiff and the Class
5  Members were overcharged when they purchased their Relevant Cellular Devices.

6      152.    It is appropriate to apply California antitrust law to the Nationwide Class and, at
7  the very least, the Nationwide Repealer State Class. Qualcomm is headquartered in California,
8  and Qualcomm subjected its competitors and OEMs that reside in California and do business in
9  California to unlawful conduct. In doing so, Qualcomm reaped a significant portion of its profits
10  from companies doing business in California. Additionally, California is the most populous state
11  in the country, meaning it was foreseeable that a substantial number of California consumers
12  would be impacted by Qualcomm's unlawful behavior.

13      153.    Plaintiff and other class members are "persons" within the meaning of the
14  Cartwright Act as defined in California Business and Professions Code § 16702.

15      154.    Qualcomm's conduct violates the Cartwright Act.

16      155.    Plaintiff seeks the relief set forth below and in this cause of action seeks such relief
17  on behalf of herself and all Class Members against Qualcomm.

18  ## FOURTH CLAIM FOR RELIEF

19  **(For Violation of Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq.*)**

20      156.    Plaintiff incorporates by reference the allegations in the above paragraphs as if
21  fully set forth herein.

22      157.    Qualcomm's conduct constitutes a violation of California's Unfair Competition
23  Law, Cal. Bus. & Prof. Code §§ 17200, *et seq.*, which protects consumers from unlawful,
24  fraudulent, and unfair business practices.

25      158.    Plaintiff brings this claim on behalf of herself, members of the Classes, and on
26  behalf of the public as private attorneys general pursuant to Cal. Bus. & Prof. Code § 17204.

27      159.    As discussed above, Qualcomm's conduct violates the Sherman Act and the
28  Cartwright Act. As such, Qualcomm's acts also constitute unlawful conduct under section 17200.

ANTITRUST CLASS ACTION COMPLAINT

Qualcomm unlawfully acquired and maintained its monopoly over the CDMA baseband processor market, premium LTE baseband processor market, and SEP Licensing Market through anticompetitive conduct, including, among other things, excluding competitors by refusing to license technology to them, engaging in exclusive dealing arrangements with its OEMs to exclude competitors, and forcing OEMs to license its patents on anticompetitive terms.

160. Qualcomm's conduct was also deceptive because it induced SSOs to use its technology on the promise that Qualcomm would comply with FRAND. But after SSOs selected Qualcomm's technology for their standards, Qualcomm refused to comply with its FRAND commitments.

161. Qualcomm's conduct is unfair to Plaintiff and Class Members who, as a direct result of the acts described above, were charged more for their Relevant Cellular Devices than they would have been but for Qualcomm's conduct.

162. Plaintiff and Class Members seek and are entitled to all forms of relief available under California's Unfair Competition Law. Pursuant to section 17203, Plaintiff and Class Members, or at least members of the Nationwide Repealer State Class, seek from Qualcomm restitution and disgorgement of all earnings, profits, compensation, benefits, and other ill-gotten gains obtained by Qualcomm as a result of its conduct in violation of Cal. Bus. & Prof. Code § 17200 *et seq.*

163. It is appropriate to apply California law to the Nationwide Class—or, at the very least, to the Nationwide Repealer State Class. Qualcomm is headquartered in California and subjected its competitors and OEMs that reside in California to its unlawful conduct. In doing so, Qualcomm reaped a significant portion of its profits from its unlawful scheme from companies doing business in California. Because California is the most populous state, it was also foreseeable that a substantial number of California consumers would be injured by Qualcomm's unlawful, deceptive, and unfair behavior.

164. Pursuant to Cal. Bus. & Prof. Code § 17204, Plaintiff and Class Members seek an order enjoining Qualcomm from continuing to engage in the acts as set forth in this Complaint.

ANTITRUST CLASS ACTION COMPLAINT

Plaintiff, Class Members, and the public will be irreparably harmed if such an order is not granted.

### FIFTH CLAIM FOR RELIEF

#### (Unjust Enrichment and Disgorgement of Profits)

165.   Plaintiff incorporates by reference the allegations in the above paragraphs as if fully set forth herein.

166.   Qualcomm has been unjustly enriched through overpayments by Plaintiff and Class Members and the resulting profits.

167.   Under common law principles of unjust enrichment, Qualcomm should not be permitted to retain the benefits conferred via overpayment by Plaintiff and Class Members for Qualcomm's chipsets and for licenses to Qualcomm's SEPs.

168.   This claim is brought under California law on behalf of all Class Members. In the event the Court does not apply California law to this claim on a nationwide basis, this claim is brought on behalf of all Class Members based on the laws of the individual States and the District of Columbia.

169.   Plaintiff seeks disgorgement of all profits resulting from such overpayment and establishment of a constructive trust from which Plaintiff and Class Members may seek restitution.

### VI.   JURY DEMAND AND DESIGNATION OF PLACE OF TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury on all issues so triable.

### VII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff Sarah Key, on behalf of herself and a class of all others similarly situated, requests that the Court enter an order or judgment against Defendants including the following:

        a.   That Qualcomm's conduct be adjudged and decreed to violate the laws alleged in the Complaint.

38

ANTITRUST CLASS ACTION COMPLAINT

1      b.   That Plaintiff and the Class Members recover damages, as provided by the

2           state laws alleged in this Complaint;

3      c.   That Qualcomm be enjoined and restrained from in any manner continuing,

4           maintaining, or renewing its anticompetitive conduct or adopting or following

5           any practice, plan, program, or device with a similar purpose or effect;

6      d.   Disgorgement and/or restitution pursuant to California Business and

7           Professions Code § 17203; and

8      e.   That Plaintiff and the Class Members be awarded pre- and post-judgment

9      f.   All other relief to which Plaintiff Sarah Key and the Class may be entitled at

10          law or in equity including injunctive relief.

11

12    Dated:  January 27, 2017                    MARC M. SELTZER
                                                  STEVEN G. SKLAVER
13                                                JOSEPH GRINSTEIN
                                                  AMANDA BONN
14                                                OLEG ELKHUNOVICH
                                                  SUSMAN GODFREY LLP

15

16                                          By:   /s/ Marc M. Seltzer

17                                                Marc M. Seltzer
                                                  SUSMAN GODFREY LLP

18
                                            Attorneys for Plaintiff Sarah Key, individually and
19                                          on behalf of all others similarly situated

20

21

22

23

24

25

26

27

28

                                                   ANTITRUST CLASS ACTION COMPLAINT